I have with us Judge Arthur Alarcon, sitting with us by designation from the Ninth Circuit. Judge Alarcon has sat with us many times. He's also quite familiar with Delaware. He's the one who's told me about a restaurant in Newcastle, which is about 12 miles south of here that I did not know about, so I will follow up on that. But Judge Alarcon, again, I say thank you, and I hope that you come back many times. If you haven't gone to Jessup's, it's wonderful. And I still concur in welcoming Judge Alarcon. Thank you. And the thing for Jessup's was not a paid political announcement. We will call the first case for today. In Re Exide Technologies, number 08-1872, Mr. Lepofsky and Mr. Klyman. May it please the Court, Robert Lepofsky, Stevenson Lee for the appellant, Enersys Delaware Inc. Your Honors, I'd like to reserve two minutes for rebuttal. That's fine. Thank you. Your Honors, we believe there are two fundamental bases upon which the lower court orders should be reversed. First, that the agreements in question are not executory. And second, even if they are executory, that rejection doesn't carry with it the impact which the lower courts have attributed to it. That is, it doesn't terminate contracts and does not allow a debtor to expand the interest that it had in property on the day of the bankruptcy filing. Do you perceive the second argument to be your stronger argument? I perceive both arguments to be correct. I was going to start with the second argument. I'm really interested in the first argument and interested in what you consider to be the agreement that we're examining to see if it's executory. Well the bankruptcy court ruled that the agreements, all four agreements, which Exide moved to reject were a single contract, a single integrated contract. Exide has not appealed that. In fact, in their brief, they assert that it was a correct ruling. So we're dealing with a contract, which is the asset purchase agreement from 1991, together with the trademark agreement, the administrative services agreement, and the letter agreement. They're a single contract for the purposes of this dispute. And in determining whether there's been substantial performance, we look at the whole batch? Correct. That's our fundamental concern and with the way that the bankruptcy judge handled the executoriness issue is that he did not, in our view, apply the substantial performance test, which is required under New York law, which is controlling. Among the criteria for the substantial performance test is a weighing of what's been done versus what's left to be done. And that's what's been done on the entire agreement? Correct. As opposed to simply the trademark? Correct. So from our perspective, what's been done is on June 10, 1991, Exide transferred an entire business, the industrial battery business of Exide was transferred to Enersys, which consisted of plants, equipment, inventory, contracts, an entire business was transferred. And Enersys paid the entire purchase price. Then there was 10 years of performance that followed that under the agreements that did still have some performance remaining after closing. But our position is on June 11, 1991, the day after the closing, this transaction had been substantially performed. By any common understanding of what that would mean, the transaction had been substantially performed on both sides. Exide had transferred the business, Enersys had paid the entire purchase price. Now, the New York Haddon test is what you're referring to in connection with substantial performance. Correct. And it gives about five different factors that you look to. In addressing Judge Ross' question, the first factor is ratio of the performance already rendered to that unperformed. Why don't you address that, and then we'll go through the next four. Well, I would have to pull out – I know one of the others – Oh, I've got them. I've got them. I'll hit them. I know one is forfeiture. No, no. I'm not asking what they are. I'm saying why don't you address the first one, which is ratio of the performance performed to that unperformed. From our perspective, the performance on June 10, 1991, outweighs to a substantial degree any performance that remained outstanding after that, and that the mistake that the bankruptcy judge made was that in analyzing substantial performance, he did not make any attempt to weigh performance rendered versus performance remaining. Now, Exide argues – That would be performance rendered under the whole agreement. Correct. Like the transfer of assets and plants. Correct. He analyzed individual obligations on a sort of micro basis. Our position is that he was required under New York law to, before he even got to the individual obligations, to take a macro look at what had been done versus what was remaining to be done, and that if you did that, in this case, the conclusion you would reach is that the contract had been substantially performed, or at least that criteria of the substantial performance test would weigh in favor of ENERSYS in finding substantial performance. Now Exide's argument to you is that the bankruptcy judge didn't have to apply the substantial performance test because this was not a construction or employment contract. Our response is that nothing under New York law limits the substantial performance test to those two particular types of contracts. There's no reason why that we can see, and Exide doesn't argue what the reason would be, that you would create a special rule for just those two types of contracts. And by the way, that's not the reason the bankruptcy judge gave for his holding. He didn't hold that substantial performance was inapplicable. He held that substantial performance had not been rendered. So the argument that Exide is asserting here is not the basis upon which the bankruptcy judge ruled. I think one of the key things is the court had said that there were substantial obligations yet to be performed with respect to quality of the product, and that's an ongoing obligation. Well our position on quality control, your honor, was it had been waived. But if it wasn't waived, then the facts that are in the record relating to quality control, we would submit, at least establish that it wasn't that important to Exide, that quality control is something that has to be in a trademark agreement in order for it to be enforceable. The licensor has to put that language in the contract. But the record establishes that after the closing, virtually nothing was done by Exide to follow up on that obligation. In other words, they never provided Enersys with the quality control criteria they wanted Exide to meet. There was some evidence that they bench tested Exide batteries, or Exide industrial batteries produced by Enersys, but the record shows that that was something they did with every competitor's batteries. In other words, they weren't doing that because of this contract, they were doing that because that's part of what they did generally in running their business. So our view is either it was waived or it was not important enough to be material in the overall scope of this contract. Now when I say that, what I want to do is create some separation from the standalone royalty bearing trademark licenses, which are behind HQ Global and Centura. Those are, in those kinds of cases, quality control, maybe it is a material obligation. The problem I have in this area is that I don't, assuming New York's law of substantial performance applies and that the integrated agreement's been substantially performed, it looks to me as if all the cases that I have found that we have a contract embodying a license agreement, that they have found that that contract, that license agreement is executory. The trademark, you're dealing with three cases, basically. You're dealing with HQ Global, Centura, and Blackstone Potato Chip. Those three cases are all standalone trademark licenses, not transferred, not provided in the context of an overall sale of a business. Are those licenses that are being paid for? Royalty bearing. Royalty bearing. As opposed to a license that was paid for in full for perpetuity? Our license was exclusive, perpetual, worldwide, fully prepaid, and in the context of a sale of an entire business. The licenses in those three cases are garden variety trademark license cases, where the royalty bearing, and the point that I would like to emphasize is that an obligation is not an obligation, a single obligation is not either always enough to find materiality or never enough to find materiality. It depends on the context of the agreement. In the context of a narrow garden variety trademark license agreement, the three cases that we've mentioned, all bankruptcy court level cases, and we would submit those were incorrectly decided, but nevertheless, all bankruptcy level decisions, all dealing with quality control they found was a material ongoing obligation. I don't think that transfers, and I don't think that means that quality control is always enough to find materiality. I think you have to examine the context, and in the context of this large agreement involving the sale of an entire business, that one obligation under one of many agreements that were executed at the closing, I would submit is not enough to find materiality, particularly given the way that Exide treated that obligation over time. You wanted to hear about, yeah, the second issue, which is the, or I guess you put it as the first issue. When you have a rejection, obviously there's a big issue in the bankruptcy world as to what a rejection means. Does it wipe the slate clean, or does it merely, going forward, get the party that rejects the contract off the hook for its obligations? You want to address that? Our position, Your Honor, is that rejection is just what the bankruptcy code says it is under 365G. It's a breach of the contract by the debtor. It creates any monetary claims are relegated to pre-petition unsecured status. It does not terminate the contract. It does not terminate, it's not a tool to expand the interests of a debtor in property that it had on the filing date. In this case, Exide had the mark on the filing date, but that interest in the mark that Exide had was limited. It was limited by the license. Under the bankruptcy code, the way that filing date property of the estate under 541 is expanded is through the avoidance powers. The avoidance powers, though, I would submit are, they don't fit well with rejection. The avoidance powers have a limited reachback period. The avoidance powers, preference, fraudulent transfer, strong arm, they all have defenses that are attached to them. Avoidance through rejection is what we call a super avoidance power. It has no limit on the reachback period. As evidenced by this case, we're talking about going back 11 years from the filing to undo a transaction. So we think that the using rejection to accomplish the result that has happened here is inconsistent with the concepts of property of the estate in a bankruptcy, with the concepts of the avoidance powers, and we think it's also inconsistent with the concepts of claim and discharge of claim. When I went looking at the, or we went looking at the cases, I mean, you cited Ground Round, which talks about it, the issue. I mean, it's been mostly, I've seen in Westbrook and Andrew in articles. First Circuit talks about it. Primarily in a footnote. But it looked like Little Joe was supportive of you. I think Little Joe is supportive of us. It's a little bit of a... But I didn't see it cited. Well, because it was in a different context. When we looked at that case, it seemed that the non-debtor was asserting even more power to rejection than Exide or the lower court here. The non-debtor in that case, the rap artist, was asserting effectively rescission, that rejection affects rescission. Once the contract was rejected by the entity to whom he had given the rights for his music, then it reverted back to him. And Eleventh Circuit said, no, that's not the case. That was his argument. And the reason that the Eleventh Circuit, in our view, said no is that they said just what we're saying. Rejection doesn't terminate contracts so that it doesn't cause the copyright, which had been sold in that case, to revert. The distinction I'm making is that in that case, since the copyright had clearly been sold, the non-debtor was really arguing for rescission, which is different than termination. And so while we think that the Eleventh Circuit could have disposed of the argument that way, they went further. And when they went further, we believe they were supportive of our view and the Andrews-Westbrook view and the Ground Round view and the Levine view of the impact of rejection, that is that it does not terminate the contract. It's a claims control mechanism to prevent administrative claims from swapping an estate. It is not a mechanism by which rights and property can be impacted. Those are the avoidance powers. I'm out of time, Your Honor, so. We'll get you back on rebuttal, Ben. Thank you. Thank you. Mr. Klyman. May it please the Court, good morning. My name is Matthew Klyman. I am counsel to Exide Technologies, the appellee in the matter before the Court. Joining me in the courtroom this morning are my co-counsel, Mr. Roger Furey and Mr. James O'Neill. Now, at the outset, the Entersys paid, what, $98 million for primarily the purchase of or the right to use this trademark, is that correct? Plus, I guess they assumed $19 million additional. Well, plus for a plant and equipment. These are all, as bankruptcy court has ruled, one document, basically one agreement. Is that correct? That's correct, Your Honor. These are indivisible and indispensable components. In considering substantial performance, therefore, we have to consider the transaction that happened back on June 10, 1991. Is that correct? That's correct, Your Honor. But the Court must also consider the obligations that were ongoing and continue to be ongoing up until the date that the bankruptcy court authorized the rejection. But the fact that there are ongoing obligations, if there has been substantial performance of the whole agreement, then we don't have an executory contract. If this Court concludes that the Haddon substantial performance test controls, then and if this Court further concludes that this integrated agreement has been substantially What other tests, just to digress for a second, what other tests would control, if it's New York law that applies? Well, Your Honor, the Haddon Court did not rule that the substantial performance test was the only test. No, they laid out various factors. Substantial performance, the ratio of performance as to what's performed compared to what's not been performed is pretty critical. Agreed, Your Honor. And that's exactly the type of analysis that the lower courts engaged in here and particularly evidenced in the bankruptcy court's extensive analysis on an obligation by obligation basis of the obligations that had been performed and were closed, including the transfer of title to property plant and equipment and the assumption of liabilities. But also this specific analysis of the obligations that remained outstanding and their significance and materiality to the parties as a whole. But back to Judge Ross' question, what we're exploring is, was in 1991 were essentially the, what were the parties intended? Was that performed, consummated, or what was left? And so you've given some things of what was left, but it looks like all the money pretty much was transferred or assumed on day one, correct? Your Honor, the monetary compensation for the assets as to which title was transferred, yes, referred as to closing. And the monetary contribution for the right to use the copyright, the right to use a trademark was transferred at that time to use it in perpetuity. Well, that's correct, Your Honor. Unremarkable. But perpetuity doesn't mean forever. It doesn't. No, Your Honor. The term perpetual in the license agreement simply means that the agreement itself did not have a calendar expiration term. But the license has a termination clause. But then you would have used the word indefinite, wouldn't you, as opposed to in perpetuity? I mean, perpetuity is like beyond my lifetime. Your Honor, that would be the case, but for the fact that the parties clearly contemplated that there could be a natural expiration or extinguishment of the license rights. Where was that? In Section 8 of the license agreement, the parties agreed that certain enumerated breaches would give Exide the authority to extinguish permission to use the copyright. Was that in connection with not going forward to closing, you mean? No, Your Honor. These are the provisions that relate to the ENERSYS use restriction and the ENERSYS quality control provisions, which the court found were material ongoing obligations of ENERSYS, still outstanding at the time of rejection. Is there an argument that those are conditions subsequent as opposed to material ongoing duties? ENERSYS has made that argument, but the lower courts properly rejected it. Our court in Columbia Gas has made that ruling, has it not? Not as to this specific type of provision. But as to there is a significant difference between a condition subsequent that may allow you to call a default versus a breach of an actual duty. Exide doesn't dispute that distinction. The example is if X happens, then I have the right to come in and terminate the contract. That's a condition subsequent versus there is an agreement of ENERSYS that it will do X. And this, to me, looked like more of a condition subsequent. Well, Your Honor, I believe the appropriate interpretation is that employed by the bankruptcy court. Bankruptcy court looked at New York law and correctly concluded that a contractual obligation can include both a duty to act and a duty to refrain from acting in a specified way. The use restriction obligation is a duty of ENERSYS to not act in a specific way. That is to say it cannot use the trademark in an infringing manner outside the scope of the limited permission granted to it under the terms of the license agreement. The quality control provisions are both an affirmative and a negative obligation imposed on ENERSYS. But basically ENERSYS had to apply by regulatory standards that were imposed on it by another authority, correct? There were like two different standards? Well, Your Honor, had there been a disagreement between the parties as to whether the quality control provisions were satisfied or not, that may well have been the governing test. But there was never a disagreement. There was never a disagreement. That's correct, Your Honor. But the fact that there was never a disagreement doesn't mean that the obligation didn't exist. In fact, it did exist and was ongoing because, as ENERSYS concedes, the quality control provisions are an essential component of a trademark license. A license divorced from the quality control provisions would be a so-called naked license under trademark law, which not only would render the license unenforceable but could actually impair the trademark owner's actual title to the trademark itself. Therefore, that obligation was a necessary and indivisible component of the obligations had to be imposed on the licensee, ENERSYS in this case, and therefore had to be outstanding and material as of the time of rejection, which is what the lower courts concluded. In exploring the substantial performance, as you know, there are some who would even go further than the issue of executory contract. And I think that there's been substantial criticism of these cases that has existed so far, and I think it's by Professor Nguyen where he said, has the article selling at first, stealing it later, the trouble with trademarks and corporate transactions and bankruptcy. Basically, his argument is that what happened here, this was a sale, pure and simple. You might have called it something different for reasons that were noted. Because you couldn't sell part of a trademark. So you had to do it another way to make it in perpetuity. Correct. Whatever perpetuity may mean. Well, Your Honor, the record below did not suggest that the license could not have been sold. It suggests that it could not have been sold in the circumstances where Exide intended, as it did, to continue using the trademark in its other lines of businesses. Right. I mean, we agree on that. An alternative transaction structure that could have been used, but was not, was that the license could have been, in fact, sold to Enersys, and Enersys licensed rights back to Exide. But we don't really need to consider that in our review of what happened in June of 1991, do we? No, Your Honor, because that didn't happen. Its only relevance is to the extent the court is analyzing the Enersys argument that the transaction should be recharacterized from a license or a sale. The statements that Enersys made that it could not have been a sale are simply incorrect. It could not have been a sale where both parties ended up with title. Trademark are unique assets in that regard, in that only one party may own title. Here, the record is very clear that the party that owned title as of closing of the 1991 transaction and through and including today is Exide. The license agreement itself includes a provision that states that the parties agreed that all title ownership and control of the trademark license will remain with Exide. And Exide tried to buy back the right to use the Exide name from Enersys, right? But, Your Honor, Enersys refused to sell. I would So Exide then had to look for another way to try to do it? I would argue that Exide attempted to purchase a termination of the license agreement. We already owned it, but we had given permission to use it in a certain license. In perpetuity. Unrevocable. Your Honor, in perpetuity, but subject to termination for certain defaults. Potentially subject, Your Honors, to equitable remedies. But there was no default. There was no purported attempt to terminate. It's almost as if what you're doing here is you're going into bankruptcy and rather than using 365 as a shield, you're using it as a sword. Your Honor, I think what this court has directed debtors to do in the Columbia Gas case is to evaluate its executory contracts as a combination of assets and liabilities. The performances owed by the estate are its liabilities. The performances owed to the estate are its assets. And the responsibility of the debtor in possession is to compare the two sides of the ledger on a contract-by-contract basis and determine whether each of its executive contracts is a net asset or a net liability. Here, Exide had no difficulty in concluding that the integrated contract was a net liability because the substantial burdens that were still outstanding as of the bankruptcy case, including the obligation to grant permission to use the trademark in a business that Exide was then operating in, made it very clear to the debtor and the lower courts agreed that this contract was a net burden. So, Your Honor, I don't believe it is. Let's assume for the moment, for the sake of argument, you're right on the executory portion. But does rejection of the trademark agreement under Section 365, does that terminate all of the rights that Enersys has? No, it does not, Your Honor. And neither of the lower courts reached that holding. The basic rule applicable to the rejection of executory contracts in this circuit is that announced by this court in the CellNet data case, that unless Section 365 of the Bankruptcy Code provides otherwise, rejection extinguishes the obligations, the ongoing obligations between the parties, and leaves the non-debtor counterparty with only a general unsecured claim. Enersys attempts to manufacture error below by characterizing the lower court's decision as termination or rescission or revocation or avoidance. But the relief granted by the lower courts accomplished none of the relief that is traditionally associated with those particular structures under traditional notions of contract law. The relief granted below was the very specific relief that is only applicable in rejection cases, that is an extinguishment of the debtor's obligations under the agreement and the conference upon the non-debtor counterparty of a general unsecured claim for breach. So your Little Joe case from the 11th Circuit you think is correct? The Little Joe case appears to be correctly decided, Your Honor, because the critical distinction between that case and this is that in Little Joe, the musical copyrights at issue were assigned from the debtor to the non-debtor party. And in attempting to use rejection as an avoidance mechanism, the debtor in that case clearly exceeded the statutory powers that exist under Section 365, and the courts were correct in refusing to equate rejection with rescission. Rejection is rejection, and that's precisely what the lower courts concluded here. Termination is a term that can be rhetorically imprecise, in part because it could be said that the obligations are terminated. And in that sense, the word termination is correct. But in the sense of termination as we traditionally think of that word in contract law as a contractual right to end performance which may or may not give rise to a claim for damages, that's not what happened here. The lower courts clearly ruled that ENERSYS would have a damages claim arising from the invocation of the Section 365 power. So this is not a termination within the plain meaning of that word under contract law. This is a rejection, and the relief granted by the lower courts is consistent with the basic rule that's applicable to all forms of executory contracts. And that was the correct holding because what the CellNet data case required the lower courts to do was look to Section 365 to determine if an exceptional case applied. And it does not. Section 365N expressly excludes trademark licenses from the definition of intellectual property. There are no other... They're just not included. I mean, but there I'm not so sure that you can argue by negative inference because when you look at the legislative history, it turned out that what we found is that Congress had said that trademarks, they didn't want to get into that thicket because since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area, trademarks, and to allow the development of equitable treatment of this situation by bankruptcy courts. Your Honor, my time is up, but if I can be allowed to respond. Go ahead. That is, in fact, exactly what the lower courts did here. The bankruptcy court fashioned an equitable remedy. Finding that the plain wording of Section 365N excluded trademarks from the protection afforded by that statute, which would have the words of the statute give counterparties to intellectual property licenses an option to retain their rights if they give up certain damages claim. The bankruptcy court correctly found that that alternative was not available. But instead the court... Well, that's not an equitable ruling. That's statutory interpretation. Correct. The equitable ruling, Your Honor, was that the bankruptcy court ordered a transition period. That the license agreement, though rejected, would have continued vitality during the term of that license period so that ENERSYS would continue the permission that it enjoined under that license. So the equitable ruling was dependent upon the statutory interpretation as the court and as you interpret the statute. Which I believe is precisely what Congress directed courts to do in evaluating licenses that are outside the scope of Section 365N, to fashion appropriate equitable remedies. Okay, but your equitable remedy is dependent upon your reading of the statute. That is correct, Your Honor. Exide's interpretation as well as that of the lower courts, as well as that of every court that has considered this precise issue, is that trademarks are excluded from Section 365N. Well, they're clearly excluded, but the point is 365N was put in as a reaction to the Lubrosol case, correct? Correct, Your Honor. And the argument here is that trademarks aren't necessarily governed by the Lubrosol case. Obviously, it's the Fourth Circuit anyway. But it looks as if when you look over the course of time, Lubrosol may not be the best law out there even in trademarks, in the trademark area. Well, Your Honor, I respectfully disagree. Every case that has considered the effect of rejection on a trademark license, both before and after the amendments to Section 365N, have concluded that the basic rule, the rule announced by this court in the Selmet data case, is the rule that governs. That is the rule that dictates the relief that is available upon rejection of a trademark license, that the party's ongoing obligations are extinguished and that the counterparty is left with an excuse. What exactly in Selmet says what you think it says? Well, Your Honor, the basic holding of Selmet, Your Honor, is to announce the relief that is dictated by the application of Section 365. I don't believe that that's a controversial proposition, that unless Section 365 provides for an exceptional case, the effect of rejection is to extinguish the obligations of the party and Section 365G provides that the counterparty in that circumstance receives an unsecured claim for breach. Or why don't we just go another way from Lubrisol? Well, Your Honor, I think doing so would be a mistake for the reasons that Congress expressly decided that it was not going to include trademark licenses. Congress punted. But the reason they punted is relevant, Your Honor, and it's the reason that Mr. Lepofsky conceded in his arguments to the court. Trademark licenses must, by law, be accompanied with quality assurance obligations. And those quality assurance obligations exist on both the licensee and the licensor. We're back into whether there was substantial performance, if you will. The quality assurance was done by ENERSYS throughout the entire period here. There was no checking that I know of in the record by Exide, was there? There absolutely was, Your Honor. At their plants? Not on their physical plants, Your Honor, but the bankruptcy court ordered cites to specific incidences of testimony in the record below of Exide's fulfillment of its obligations with respect to the quality control provisions. And what were they? Your Honor, They had a manual that they turned over at the time of 1991, and there was some minor checking done thereafter. What else? Your Honor, there was periodic checking of the batteries, evaluation of market conditions, discussions with the customers. Periodic checking every three months, every what? Your Honor, I don't believe that there was a regimented schedule, nor was such imposed on Exide. How many incidents were noted in the record of checking of the quality of the batteries on the market? Your Honor, I don't believe that the record establishes the number of incidences, merely that it occurred on a periodic basis throughout the course of the duration of the license. Thank you very much. Thank you. Your Honor, just a few brief statements in rebuttal. First of all, CELNET does not stand for the proposition that Mr. Kleiman has attributed to it. In CELNET, there was no issue as to the impact of rejection on the non-debtor. In fact, the non-debtor was not even a party to the CELNET litigation. Mr. Kleiman says that there was not termination here. It sure feels like termination for ENERSYS. I mean, they're losing all of their rights to use a trademark that they paid for in full 10 years before the bankruptcy was filed. And the argument that the bankruptcy judge created some equitable result here is just flat wrong. The bankruptcy judge clearly felt he was bound by the provisions of 365N and the fact that trademarks were not included in 365N. To find that, nothing survived the rejection other than the ability to file an unsecured claim. So the bankruptcy judge, as Judge Roth has noted, clearly was not applying equitable principles in reaching his decision. I think that Judge Ambrose was correct in his, or at least in his questioning, was on the right track in terms of the conditions, the quality control, and the use restrictions. Those were conditions. They could, after the fact, have caused a termination, actually a two-year unwind of the trademark. But they were conditions subsequent. They were conditions just like the conditions in Columbia Gas. And the last point that I would make is that this is clearly an attempt to use rejection as a sword and not a shield. This is not the use to which rejection was supposed to be put. But the reason that it was so obvious to Exide that it would have a net benefit, that there was a net benefit to rejecting here, is simple. They were fully paid in 1991 for all of these rights. So is this the use as a sword rather than a shield? I would submit that it absolutely is. Thank you, Your Honors. Thank you. And thank you to both counsel for very well presented arguments. We'll take the matter under advisement and call the next case.